**In re Robert Joseph BROWN, Debtor.**

**No. 6:05–bk–15294–ABB.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

July 3, 2008.

---

James H. Monroe, James H. Monroe, P.A., Orlando, FL, for Debtor.

## *ORDER*

ARTHUR B. BRISKMAN, Bankruptcy Judge.

This matter came before the Court on remand pursuant to the Order entered on November 2, 2007 by the United States District Court for the Middle District of Florida, Orlando Division ("District Court").[1] State Farm Mutual Automobile Insurance Company and State Farm Fire & Casualty Company (collectively, "State Farm"), a creditor herein, appealed this Court's November 14, 2006 Order (Doc. No. 100) ("Confirmation Order") confirming the Second Amended Chapter 13 Plan of Robert Joseph Brown, the Debtor herein ("Debtor"). The District Court reversed and remanded the Confirmation

---

**1.** District Court Case No. 6:07–cv–316–GAP Doc. No. 35. District Court Case No. 6:07– cv–00546–GAP was consolidated with 6:07–cv–316–GAP.

Order for further findings on various confirmation issues.

The District Court identified in its November 2, 2007 Order five areas of concern raised by State Farm in its appeal of the Confirmation Order, but could not assess this Court's determinations on those issues "due to a lack of findings in the Confirmation Order":

(i) Whether Brown's case should have been dismissed as a two-party dispute.

(ii) Whether the Plan was proposed in good faith.

(iii) Whether the Plan was feasible and met the best interest of creditors test.

(iv) Whether Brown was eligible to proceed under Chapter 13.

(v) Whether the Bankruptcy Court failed to make sufficient findings of fact and conclusions of law in the Confirmation Order.[2]

The District Court found the Bankruptcy Court made insufficient findings on the elements of confirmation and reversed and remanded the Confirmation Order. It expressed concern regarding the Debtor's disclosures:

After reviewing the three briefs filed in this case, the Court finds several issues of concern, particularly (but not solely) in regard to Brown's apparent failure to disclose ownership of Spectrum DX Services, Inc. until after he had distributed

its remaining capital to himself in the guise of a salary.[3]

The District Court directed:

[T]he Confirmation Order is **REVERSED AND REMANDED** to the Bankruptcy Court for additional findings of fact in conformity with this order, and particularly in the areas of good faith and feasibility.[4]

The Court conducted a hearing on March 20, 2008 at which the Debtor, counsel for the Debtor, counsel for State Farm, and Laurie K. Weatherford, the Chapter 13 Standing Trustee ("Trustee"), appeared.[5] The parties were granted leave to submit closing briefs. Closing briefs were submitted by the Debtor, the Trustee, and State Farm.

The issues identified by the District Court are interconnected and require a detailed analysis of the entirety of this case, and particularly with regard to the Debtor's good faith, which is determined by a review of the totality of circumstances of the case.

The Court makes the following Findings of Fact and Conclusions of Law after reviewing the pleadings and evidence, hearing live testimony and argument, and being otherwise fully advised in the premises.

### FINDINGS OF FACT

#### Prepetition Background: State Farm Civil Action

The genesis of this confirmation dispute is litigation instituted by State Farm in

---

2. *Id.* (Doc. No. 35) at p. 2.

3. *Id.*

4. *Id.* at p. 4.

5. An Order was entered on February 12, 2008 (Doc. No. 172) setting the supplemental hearing for March 20, 2008. State Farm, two days prior to the hearing, filed a Response

(Doc. No. 174) to the Order asserting the Court lacked jurisdiction to reopen the record. State Farm's position is not consistent with the findings and directives of the District Court's Order. State Farm's objection to the holding of a supplemental hearing was overruled in open Court.

2003 against the Debtor and his company Spectrum DX Services, Inc. ("Spectrum"), and others. Spectrum is a Subchapter S corporation owned solely by the Debtor.[6] He has been the sole director and an officer of Spectrum since at least 2003.[7] Spectrum is located at 1920 S. Babcock Street, Melbourne, Florida ("Babcock Street Property"), which real property it formerly owned.

Spectrum worked with client companies and individual physicians throughout the United States interpreting medical tests conducted by the clients and preparing reports of the interpretations.[8] Gary M. Weiss, M.D. ("Weiss") was Spectrum's staff physician and interpreted the tests.[9] Spectrum was involved in other business ventures including vascular screening and land development, but its main source of income was the interpretive practice. The Debtor is not a medical doctor or neurologist.[10]

State Farm instituted a civil action against the Debtor, Spectrum, Weiss, and others alleging they submitted fraudulent reports and invoices for unnecessary medical tests performed, or documented as performed but unperformed, on automobile accident victims. State Farm sought to recover damages in excess of $5,400,000.00 pursuant to federal racketeering statutes (RICO) and Florida common law fraud.

The case was transferred to the United States District Court for the Middle District of Florida, Orlando Division (the "District Court Litigation") in 2003.[11]

### Prepetition Background: Business Decline and Divorce

The District Court Litigation profoundly impacted the Debtor professionally and personally. Spectrum, at the height of its business, was performing interpretations for fifty to sixty clients per month and its 2002 gross income was approximately $1,100,000.00.[12] Spectrum's gross income subsequently steadily decreased and the Debtor closed Spectrum's interpretive business on April 30, 2005.[13] The Debtor explained the demise of Spectrum's core business was a result of the District Court Litigation.[14]

The Debtor sought new employment and began working for Harbor City Medical Imaging ("Harbor"), a five-physician radiology practice located in Melbourne, Florida, in July 2005 as its business administrator.[15] He handles all administrative responsibilities including contract negotiations, new business opportunities, client interfacing, and financial matters.[16] He has no ownership interest in Harbor [17] and is not an officer or a director.[18] He earns an annual salary of $55,000.00 with Harbor, reflecting a $10,000.00 September

6. Oct. 24, 2006 Hr'g Tr., p. 26, ll. 19–25.

7. *Id.* at p. 45.

8. *Id.* at p. 41.

9. *Id.*

10. Oct. 24, 2006 Hr'g Tr., pp. 47–48.

11. The case is captioned *State Farm Mutual, et al. v. Gary M. Weiss, et al.*, Case No. 6:03–cv–01645–GAP–KRS.

12. Oct. 24, 2006 Hr'g Tr., pp. 34–35; Debtor's Exh. 11 (from Oct. 24, 2006 Hr'g).

13. *Id.* at p. 15, ll. 11–22, p. 36, ll. 11–17; Debtor's Exh. Nos. 13, 14, 15 (from Oct. 24, 2006 Hr'g).

14. Oct. 24, 2006 Hr'g Tr., pp. 15–16, 29.

15. *Id.* at pp. 9, 37.

16. *Id.* at pp. 9–10.

17. *Id.* at p. 10, ll. 11–20.

18. Oct. 24, 2006 Hr'g Tr., p. 10, ll. 8–10.

2006 increase.[19] His gross monthly salary with Harbor is $4,600.00 and the net is $3,430.10.[20]

The Debtor and his wife divorced in July 2004 pursuant to the Final Judgment of Dissolution of Marriage with Minor Children (Uncontested), incorporating their Marital Settlement Agreement (collectively, "Divorce Decree"), entered by the Circuit Court of the Eighteenth Judicial Circuit in and for Brevard County, Florida.[21] They have two children ages seventeen and thirteen. The Divorce Decree requires the Debtor to:

(i) pay monthly child support of $3,000.00 and $1,000.00 permanent alimony to his ex-wife;

(ii) maintain medical and dental insurance for his children and pay seventy-five percent of all medical and dental expenses not covered by insurance.

(iii) maintain life insurance on his life naming his ex-wife and children as beneficiaries.[22]

He is current on these obligations.

The Debtor and his former wife, individually and jointly, owned various assets at the time of their divorce. The former wife was not an owner, officer or director of Spectrum; the Debtor was and continues to be its sole shareholder and president.[23] She relinquished any right, title or interest in Spectrum and its assets to the Debtor. The Divorce Decree equitably distributed the parties' assets:

(i) The Debtor quitclaimed "all of his right, title and interest" in 3705 Eagle Way, Melbourne, Florida, his former marital home ("Marital Home"), to his former spouse.[24]

(ii) The parties retained exclusive ownership of their individual retirement accounts.[25]

(iii) The former wife signed to the Debtor "all of her right, title, and interest in the Husband's business, SPECTRUM DX SERVICES, INC., as well as its furnishings and equipment contained within the business premises ..." and quitclaimed to him "her right, title, and interest to ..." Spectrum's Babcock Street Property.[26]

(iv) The Debtor's former spouse, in exchange for relinquishing any interest in Spectrum to the Debtor, was granted an equitable interest in five parcels of real property titled in Spectrum's name.[27] The Divorce Decree directed the Debtor to "immediately put the properties for sale at the maximum price that in his discretion he believes is a marketable price" with "all net proceeds" to be paid to the former wife.[28]

---

**19.** Oct. 24, 2006 Hr'g Tr., p. 7, ll. 14–16; Debtor's Exh. 3 (from Oct. 24, 2006 Hr'g) (second page (the payment advice) only admitted).

**20.** Oct. 24, 2006 Hr'g Tr., p. 7, ll. 20–23.

**21.** Debtor's Exh. Nos. 6, 7 (from Oct. 24, 2006 Hr'g).

**22.** Debtor's Exh. No. 7, pp. 4, 7, 8 (from Oct. 24, 2006 Hr'g).

**23.** *Id.* at p. 10.

**24.** *Id.* at pp. 8–9.

**25.** *Id.* at p. 12.

**26.** Debtor's Exh. No. 7, pp. 9–10 (from Oct. 24, 2006 Hr'g); Oct. 24, 2006 Hr'g Tr., pp. 63–64.

**27.** Debtor's Exh. No. 7, pp. 10–11 (from Oct. 24, 2006 Hr'g); Oct. 24, 2006 Hr'g Tr., pp. 64–65.

**28.** Debtor's Exh. No. 7, pp. 10, 11 (from Oct. 24, 2006 Hr'g).

The five properties were sold and the net cash proceeds were transferred to the former wife pursuant to the terms of the Divorce Decree.[29]

(v) Spectrum owned a parcel of real property located at 830 Ballard Drive, Melbourne, Florida 32935, which was sold and the net proceeds were equally divided between the Debtor and his former spouse.[30]

The Debtor's former spouse received approximately $310,000.00 from the sale of the six Spectrum properties.[31]

### Prepetition Background: Babcock Street Property Sale and Lease

Spectrum sold the Babcock Street Property on October 3, 2005 to Melbourne Medical Properties LLC ("MMP") for $400,000.00, with net proceeds of sale of $166,162.72.[32] MMP is owned by one of the Harbor physicians.[33] The Debtor has no interest in MMP. The net sale proceeds were deposited into Spectrum's Bank of America account, Account No. 002834562325, on October 3, 2005.[34]

Spectrum, post-sale, leased space in the Babcock Street Property from MMP for $500.00 per month for a one-year term pursuant to a Commercial Lease ("Lease") executed on October 1, 2005.[35] State Farm asserted the Lease was an individual liability of the Debtor, but did not establish he executed the Lease in his individual capacity. The Lease is a corporate responsibility and did not constitute an individual liability of the Debtor.

### Bankruptcy Filing and State Farm's Involvement

The Debtor filed the above-captioned individual Chapter 13 case on October 14, 2005 ("Petition Date"), prior to the commencement of the trial of the District Court Litigation. He explained his reasons for filing:

> I filed Chapter 13 because my business started to fail, the weight of [the State Farm] lawsuit. I lost many clients. The diminishing of income continued to occur over periods of time. I had the expenditure of defending this case in Federal Court and so a lot of income and a lot of my time was being dedicated to this case. Also obviously the loss of income from the business ... Other things that occurred, I was also divorced.[36]

The Debtor paid the Chapter 13 filing fee and is in compliance with all filing requirements. He has not been a debtor in any previous bankruptcy cases.

State Farm has been actively involved in the Debtor's bankruptcy case. It:

(i) Conducted extensive discovery of the Debtor in connection with the bankruptcy case and the District Court Litigation, both pre- and post-petition.

(ii) Filed an unsecured non-priority claim of $5,466,366.72, Claim No. 3,

---

29. Debtor's Exh. Nos. 6, pp. 10–11 and 7, p. 8 (from Oct. 24, 2006 Hr'g).

30. Debtor's Exh. No. 7 at p. 11 (from Oct. 24, 2006 Hr'g).

31. Oct. 24, 2006 Hr'g Tr., pp. 64–65, 67.

32. State Farm's Exh. No. 6 (from Oct. 24, 2006 Hr'g).

33. Oct. 24, 2006 Hr'g Tr., p. 74.

34. State Farm's Exh. No. 17 (from Oct. 24, 2006 Hr'g).

35. State Farm's Exh. No. 14 (from Oct. 24, 2006 Hr'g).

36. Oct. 24, 2006 Hr'g Tr., pp. 15–16.

asserting treble damages pursuant to RICO.

(iii) Sought dismissal of the case (Doc. No. 38) asserting the Debtor was ineligible to be a Chapter 13 debtor pursuant to Section 109(e) of the Bankruptcy Code contending its claim was both noncontingent and liquidated on the Petition Date purposes of the U.S.C. Section eligibility requirements exceeded the Chapter 13 jurisdictional limits requiring the dismissal of the Debtor's case.

(iv) Objected To confirmation of the Debtor's plans (Doc. Nos.37, 81).

State Farm's dismissal motion was denied by the Order entered on June 23, 2006 (Doc. No. 61). Its claim was determined to be unsecured and unliquidated on the Petition Date and could not be included in the Section 109(e) eligibility calculation. No reconsideration or appeal of the June 23, 2006 Order was sought.

State Farm was granted relief from the automatic stay pursuant to 11 U.S.C. Section 362(d)(1) (Doc. No. 77) for the limited purpose of liquidating its claim in the District Court Litigation.[37]

### District Court Litigation

The District Court conducted a multi-week jury trial in August and September 2006:

(i) The jury found in favor of State Farm and against the Debtor on the common law fraudulent misrepresentation count and awarded State Farm compensatory damages of $63,046.85 (Doc. No. 86).[38]

(ii) The jury found State Farm was entitled to punitive damages on the common law fraudulent misrepresentation count.

(iii) The jury was unable to reach a verdict on the substantive civil RICO count and found State Farm failed to prove its RICO conspiracy count. State Farm made known in the Bankruptcy Court proceedings its intention to retry the case.

(iv) State Farm's motion to amend the jury's damages finding was granted and an amended judgment was entered on November 28, 2006 by the District Court against the Debtor and Spectrum, jointly and severally, in the amount of $126,093.71 in compensatory damages and $100,000.00 in punitive damages.

(v) The parties entered into a settlement agreement and the District Court Litigation was dismissed with prejudice on May 21, 2007. The amended judgment constitutes a final non-appealable judgment.

State Farm filed an amended claim for $226,093.71, Claim No. 5, based upon the November 28, 2006 amended judgment. State Farm holds an allowed general unsecured claim of $226,093.71.

### Debtor's Disclosures

The Debtor filed his Schedules and Statement of Financial Affairs on Novem-

---

**37.** State Farm argued during the stay relief proceedings the Section 109(e) eligibility determination was not finished contending the results of the District Court Litigation should be determinative regarding the Debtor's eligibility to be a Chapter 13 debtor. This Court held: "The plain and unambiguous language of § 109(e) resolves the issue … State Farm's claim was unliquidated on the Petition Date

… The liquidation, of State Farm's claim in the District Court Litigation, will not [a]ffect the Debtor's § 109(e) eligibility calculation." Doc. No. 77 (Aug. 4, 2006 Order) at pp. 5–6.

**38.** Debtor's Exh. No. 1 (from Oct. 24, 2006 Hr'g). The jury reached the same verdict as to Spectrum DX Services Inc. (*see* District Court Litigation Doc. Nos. 510, 511).

ber 8, 2005.[39] He listed as assets in Schedules A and B:

(i) One parcel of real property, the Marital Home, valued at $395,000.00, which is to be transferred to his former spouse pursuant to the Divorce Decree;

(ii) Personal property valued at $136,904.33 including: cash $50.00; Bank of America account $7,000.00; furniture and household items $1,250.00; two IRAs totaling $121,354.33; and a Mazda Miata $7,250.00.[40]

Virtually all of the personal property is exempt.

The Debtor listed one secured creditor in Schedule D, SunTrust Mortgage, Inc. and more than 150 unsecured creditors in Schedule F.[41] Many of the Schedule F creditors were listed as holding unliquidated, disputed claims of unknown amounts and appear to relate to Spectrum's business.[42] The Debtor, concerned about potential claims of other insurance companies, listed every insurance company known to him as a precaution.[43] The disclosure rules governing bankruptcy cases required the Debtor to list all such claims including disputed, contingent, and unliquidated claims.

State Farm is the only unsecured creditor who filed a claim. Claims 1, 2, and 4, the only other claims filed in the case, are

secured claims. Claim No. 1 filed by Riverside National Bank in the amount of $88,561.32 relates to a Spectrum loan guaranteed by the Debtor and is secured by Spectrum's real property. Claim No. 2 filed by Mazda American Credit in the amount of $6,703.79 is secured by the Debtor's 1999 Mazda Miata. Claim No. 4 filed by SunTrust Mortgage, Inc. in the amount of $136,952.01 is secured by the Marital Home.

Melbourne DX Testing, Inc. ("Melbourne DX") was listed as the Debtor's employer in Schedule I from which he earned gross monthly wages of $2,166.67 and Harbor was listed as an additional source of income of $2,851.04 per month.[44] Melbourne DX provides various treatments utilizing lasers including appetite suppression, pain management, and facial rejuvenation[45] The Debtor performs administrative services for the company.[46] The company is owned by Brenda McKee ("McKee"), the Debtor's girlfriend.[47] The Debtor has no ownership interest in Melbourne DX and is not a director or an officer of the company.[48]

The Debtor, as reflected in Schedule J, pays $4,000.00 per month to his former wife pursuant to their Divorce Decree for child support and alimony.[49]

The Debtor did not list an interest in Spectrum as an asset in his original Schedule B and listed "None" for:

---

39. Debtor's Exh. Nos. 2, 9 (from Oct. 24, 2006 Hr'g) (Doc. No. 7).

40. Debtor's Exh. No. 2 (from Oct. 24, 2006 Hr'g).

41. *Id.*

42. *Id.*

43. Oct. 24, 2006 Hr'g Tr., pp. 80–81.

44. Debtor's Exh. No. 2 (from Oct. 24, 2006 Hr'g) (Doc. No. 7).

45. Oct. 24, 2006 Hr'g Tr., pp. 11–12.

46. *Id.* at p. 11.

47. *Id.* at p. 13.

48. *Id.* at p. 12.

49. Debtor's Exh. Nos. 2, 4, 6, 7 (from Oct. 24, 2006 Hr'g).

(i) "Stock and interests in incorporated and unincorporated businesses";

(ii) "Interests in partnerships or joint ventures"; and

(iii) "Other personal property of any kind not already listed."

He did, however, disclose the existence of Spectrum and his interest in it in his bankruptcy papers:

(i) He listed Spectrum in Schedule H as a co-debtor for numerous debts and in Schedule I as the source of monthly income of $2,467.00.[50]

(ii) He disclosed in Question No. 18 of his Statement of Financial Affairs Spectrum as a business in which he was "an officer, director, partner, or managing executive" with such business involvement spanning the period "1996–Present."[51]

The Debtor disclosed his interest in Spectrum to the Trustee in the early stages of his case, prior to his meeting of creditors.[52] The Trustee required the Debtor file with her monthly financial reports through the confirmation hearing.[53] The Debtor provided the Trustee financial information relating to Spectrum and timely filed with her thirteen monthly financial reports.[54] Each report contained detailed personal bank records disclosing all of his bank account transactions and detailed financial records for Spectrum including balance sheets, profit and loss statements, and transaction statements listing all corporate deposits and expenditures. The

Debtor has fully cooperated with the Trustee throughout this case.

The Debtor disclosed his interest in Spectrum on the record at his Section 341 meeting of creditors, which was conducted and concluded by the Trustee on December 1, 2005. The Debtor produced at his Section 341 meeting a balance sheet reflecting Spectrum had assets of approximately $97,000.00 and the closing statement for the pre-petition sale of the Babcock Street Property.[55] State Farm's local counsel appeared at the meeting of creditors and had opportunity to examine the Debtor and the documents.[56]

The Debtor filed amended Schedules B, I, and J:

(i) Schedule B was amended to list the Debtor's ownership of "100% of Spectrum DX Services, Inc. (Corporation's liabilities exceed its assets)" with a value of "$0.00."[57]

(ii) Schedule I amendments include: (a) changing the Debtor's length of employment with Melbourne DX Testing, Inc. from two months to one year; (b) removing Spectrum as a source of monthly income; (c) increasing the monthly income from Harbor City Medical Imaging from $2,851.04 to $3,430.10; and (d) reducing his total monthly income from $7,058.96 to $5,171.02.[58]

(iii) Schedule J was amended to remove various expenditures resulting in a

---

50. Debtor's Exh. No. 2 (from Oct. 24, 2006 Hr'g).

51. Debtor's Exh. No. 9 (from Oct. 24, 2006 Hr'g) (Doc. No. 7).

52. Oct. 24, 2006 Hr'g Tr., p. 153.

53. Oct. 24, 2006 Hr'g Tr., p. 153; Mar. 20, 2008 Hr'g Tr., p. 48.

54. Oct. 24, 2006 Hr'g Tr., p. 153.

55. Mar. 20, 2008 Hr'g Tr., pp. 47–48.

56. *Id.*

57. Debtor's Exh. No. 10 (from Oct. 24, 2006 Hr'g) (Doc. No. 83).

58. Debtor's Exh. No. 4 (from Oct. 24, 2006 Hr'g) (Doc. No. 84).

reduction of the Debtor's total monthly expenditures from $6,530.00 to $4,670.00.[59]

The amendments to Schedules I and J resulted in a modest decrease of the Debtor's monthly net income from $528.96 to $501.02. The sum of $501.02 constitutes the Debtor's monthly disposable income, which is subject to turnover to the Trustee for funding of the Debtor's Chapter 13 plan. The Debtor reported his sources of income. His income and expenses are stable and not anticipated to fluctuate.

The Debtor's original Schedules I and J accurately reflected his monthly income and expenses on the Petition Date.[60] The amendments to Schedules I and J accurately reflect post-petition changes in the Debtor's financial circumstances:

(i) His annual salary with Harbor increased resulting in increased monthly income from Harbor;

(ii) Spectrum ceased generating income as it had not been a viable business since August 2006; and

(iii) He moved in with McKee, thereby eliminating his rental, utilities, food, and other monthly costs.[61]

The Debtor explained his failure to list his interest in Spectrum in his original Schedule B was an oversight.[62] The Debtor's testimony was credible. He did not attempt to conceal his interest in Spectrum. He disclosed an interest in Spectrum in his Statement of Financial Affairs. He disclosed Spectrum was a source of monthly income in Schedule I and was a co-debtor of various debts in Schedule H. He disclosed the interest to the Trustee early in his bankruptcy case and at his meeting of creditors.

Spectrum is a separate and distinct entity from the Debtor. The Debtor was not required to disclose Spectrum's assets in his bankruptcy papers, but only his interest in Spectrum, namely his share ownership and its value. Its assets are not property of the Debtor's bankruptcy estate.

### Debtor's Second Amended Plan

State Farm objected to the Debtor's initial (Doc. No. 9) and First Amended (Doc. No. 57) Plans on various grounds including: (i) the Debtor failed to establish he has regular income; (ii) feasibility; (iii) failure to meet the liquidation test of 11 U.S.C. Section 1325(a)(4); and (iv) bad faith "as his bankruptcy schedules contain false and/or misleading information" and "the Debtor has only filed Chapter 13 to take advantage of the super-priority discharge."[63]

The Debtor's Second Amended Chapter 13 Plan[64] ("Plan") proposed to pay $500.00 to the Trustee for thirty-six months and provides:

(i) Plan payments would first be distributed to priority creditors, consisting of the Debtor's counsel for Chapter 13 fees and the Trustee for her statutory commission, with the balance of funds to be distributed to State Farm, the sole unsecured creditor that filed a claim.

(ii) Estimates a thirty-percent distribution to State Farm based upon its allowed claim of $63,046.85 (its al-

---

**59.** *Id.*

**60.** Oct. 24, 2006 Hr'g Tr., p. 6.

**61.** *Id.* at pp. 7–9, 13–4, 58; Debtor's Exh. No. 3 (from Oct. 24, 2006 Hr'g) (pay advice only admitted into evidence).

**62.** Oct. 24, 2006 Hr'g Tr., p. 27, ll. 3–6.

**63.** Doc. Nos. 37, 81.

**64.** Debtor's Exh. No. 5 (from Oct. 24, 2006 Hr'g) (Doc. No. 90).

lowed claim amount prior to entry of the amended judgment in District Court).

(iii) No payments are to be made to the secured creditors SunTrust Mortgage, Riverside Bank, or Mazda American Credit due to the Debtor's surrender of their collateral.

The confirmation hearing was held on October 24, 2006 at which the Debtor, his counsel, the Trustee, and counsel for State Farm appeared.[65] The Debtor was current with his Chapter 13 filings and Plan payments of approximately $12,000.00 to the Trustee, consisting of one year of plan payments and turnover of his tax refund.[66] He committed his disposable income to the Trustee for the duration of his plan.[67]

The Trustee supported confirmation of the Plan[68] and, after a lengthy confirmation hearing, the Plan was confirmed. State Farm appealed the Confirmation Order.

The Confirmation Order was the standardized order this Court utilizes in the Chapter 13 plan confirmation process. Standardized orders are used to ensure consistency and efficiency in the confirmation process. Approximately 1,600 Chapter 13 cases are filed in this Court annually. The undersigned Judge conducts one to three monthly Chapter 13 calendars with an average of sixty initial and thirty final confirmation hearings. Orders containing more specific findings and conclusions would be beneficial in factually contested confirmation matters where there is a potential for appeal.

The Debtor, during the pendency of the appeal of the Confirmation Order, sought modification of the Confirmation Order to prevent the Trustee from disbursing payments to State Farm during the appeal on the basis the funds were needed to compensate his counsel for the appeal (Doc. No. 134). The Debtor's motion was partially granted and the Trustee was required to retain one-half of the Plan payments earmarked for State Farm "pending further order of this Court" on March 1, 2007 (Doc. No. 144).

State Farm appealed the March 1, 2007 Order. The District Court affirmed the March 1, 2007 Order on November 6, 2007.[69]

### Confirmation Requirements

The Debtor has the burden to establish the six elements required for confirmation of the Plan:

(i) the plan complies with the Chapter 13 provisions and with all applicable provisions of the Bankruptcy Code;

(ii) all required fees and charges be paid before confirmation;

(iii) the plan has been proposed in good faith and not by any means forbidden by law;

(iv) the "best interests of creditors test" has been met establishing the allowed unsecured claim holders will each receive in Chapter 13 an amount that is equal to or more than what each would receive in a Chapter 7 liquidation;

(v) allowed secured claims are properly provided for; and

---

**65.** The Plan was orally modified at the confirmation hearing to clarify the effective date of the Plan was the date of confirmation.

**66.** Oct. 24, 2006 Hr'g Tr., p. 15.

**67.** *Id.* at p. 156.

**68.** *Id.* at p. 3, ll. 14–17.

**69.** District Court Case No. 6:07–cv–316–GAP Doc. No. 36.

(vi) the debtor will be able to make all plan payments and to comply with the plan.

A debtor must additionally establish if the holder of an allowed unsecured claim objects to confirmation: the plan provides that all of the debtor's projected disposable income to be received in the three-year period, beginning on the date the first payment is due, will be applied to make payments under the plan.

The Debtor testified in support of the Plan at the confirmation hearing. He was extensively cross-examined by State Farm and the Trustee. A substantial portion of State Farm's examination was not relevant to the confirmation requirements.

The Debtor established:

(i) He paid all required filing fees and charges prior to confirmation.

The Plan complies with the Chapter 13 provisions and with all applicable provisions of the Bankruptcy Code.

The Plan was not proposed by any means forbidden by law.

(ii) Secured claims have been properly provided for by the Debtor surrendering all property securing the claims.

(iii) He has been and continues to be able to make all Plan payments and comply with the Plan.

The "good faith" and "best interests of creditors" confirmation elements were the focus of the confirmation and March 20, 2008 hearings. The adequacy of the Debtor's disclosures regarding Spectrum and its value on the Petition Date were primary issues raised by State Farm. State Farm asserted the Debtor acted in bad faith in connection with the sale and leaseback of the Babcock Street Property and various payments made from Spectrum's bank account. State Farm argued those transactions affected the Debtor's liquidity.

The Debtor's interest in Spectrum, his shares of stock, are property of the estate.[70] Spectrum's tangible and intangible assets are not property of the estate. The value of the Debtor's interest in Spectrum was based upon the value of the stock on the Petition Date.

The Babcock Street Property was sold in accordance with the terms of the Divorce Decree. The evidence establishes the pre-petition sale of the Babcock Street Property was an arm's length transaction for fair market value.

The Lease expired by its own terms on September 30, 2006 and is not a component of the Plan. The Lease was not a liability of the Debtor to be included in a plan and did not affect his liquidity. Spectrum was making the Lease payments post-petition and no evidence was presented establishing the Lease affected the Debtor's ability to fulfill the Plan requirements. The Debtor did not engage in bad faith conduct with respect to the Babcock Street Property sale and Lease transactions.

State Farm challenged the valuation of Spectrum asserting the Debtor did not meet the "best interests of creditors test." The Debtor was required to establish his unsecured creditors will receive through the Plan at least as much as they would have received in a Chapter 7 case.

Trustee Gene Chambers ("Chambers"), an experienced and well-respected Chapter 7 Panel Trustee for the United States Bankruptcy Court for the Middle District of Florida, Orlando Division, testified as the Debtor's expert witness as to the "best

---

**70.** A Chapter 13 debtor remains in possession of all property of the estate pursuant to 11 U.S.C. § 1306(b), except as provided in a confirmed plan or confirmation order.

interests of creditors test" and Chapter 7 administrative procedure. She is an expert in asset analysis and liquidity. Brian Fisher, a Certified Public Accountant and the long-standing accountant for Spectrum, testified as the Debtor's expert witness on valuation of divorce assets and fair market value of businesses being bought and sold. Both parties presented documentary evidence in support of their expert conclusions.

Spectrum is a closely-held company and neither the Debtor nor any of his family members were interested in purchasing the stock.[71] Chambers explained property of the estate encompasses only the Debtor's stock:

> In order to get to the actual assets of the corporation, the trustee would have to remove the current board of directors, appoint his or herself as, or elect his or herself as a director and then take over the management of the corporation which carries with it all sorts of personal liability that goes with being the office and director of a corporation. You're not going to find a trustee who will do that except in extraordinary circumstances.[72]

She concluded, after reviewing Spectrums' financials, the Debtor's Schedules and Statements, and having knowledge of the District Court Litigation:

> I don't think the stock in this case would be able to be liquidated unless the debtor himself wanted to make an offer. The corporation was being sued. There are lurking corporate liabilities. Quite frankly, I think I would have a terribly

difficult time finding a purchaser for the corporate stock.

> . . .

> I think the value to a Chapter 7 estate would be zero. I think most trustees would probably abandon the stock.[73]

Chambers' conclusions were unrefuted.

Fisher testified an informed third party would not purchase Spectrum's stock given the "substantial cloud" of the District Court Litigation and Spectrum's dwindling business.[74] The division of assets in the Debtor's divorce was "as equitable as they could be."[75] Fisher's conclusions were unrefuted.

The Trustee agrees the value of the Debtor's interest in Spectrum was zero or negligible on the Petition Date and post-petition. She conducted a liquidity/best interests of creditors test and determined the Debtor met the test. He has submitted all of his disposable income to fulfillment of the Plan.

The Debtor established his stock in Spectrum had no or negligible value on the Petition Date or post-petition and his unsecured creditors will receive through the Plan at least as much as they would have received in a Chapter 7 case.

Spectrum's bank account balance prior to the sale of the Babcock Street Property was $11,173.78.[76] The account balance peaked at $177,137.50 on October 3, 2005 with the deposit of the proceeds of sale of the Babcock Street Property.[77] The account balance on the Petition Date was

---

71. Oct. 24, 2006 Hr'g Tr., pp. 153–54.

72. *Id.* at p. 108.

73. Oct. 24, 2006 Hr'g Tr., p. 109.

74. *Id.* at p. 124.

75. *Id.* at p. 127.

76. State Farm's Exh. No. 16 (from Oct. 24, 2006 Hr'g).

77. State Farm's Exh. No. 17 (from Oct. 24, 2006 Hr'g).

$170,132.88.[78] The balance decreased monthly to $3,796.73 on August 31, 2006.[79] Spectrum's expenditures were detailed in monthly reconciliation reports[80] prepared by the Debtor:

(i) postpetition payments to Spectrum's and the Debtor's legal counsel totaling $50,000.00;[81]

(ii) prepetition payments to the Debtor totaling $15,010.10;

(iii) post-petition payments to the Debtor totaling $22,421.21[82];

(iv) monthly rent of $500.00 to MMP;

(v) the Debtor's bankruptcy attorney's retainer[83];

(vi) payments to the Debtor's former spouse and McKee; and

(vii) various utilities and business expenses.

The expenditures were fully and satisfactorily explained by the Debtor. McKee worked for Spectrum for approximately twelve years.[84] Spectrum paid wages and severance to her for her services.[85] Spectrum kept McKee and the Debtor's former spouse on its payroll so a group insurance policy could be maintained, which policy provides coverage for the Debtor's children.[86]

The majority of the disbursements include salary distributions to the Debtor for pre-and post-petition services and the $50,000.00 post-petition payment for attorneys' fees. The Debtor provided services for Spectrum's benefit pre- and post-petition. The payments from Spectrum to the Debtor were for his salary, which he disclosed on original Schedule I, which he then amended when that income ceased.

The questions raised by State Farm as to what fees were paid and what was owing to bankruptcy counsel were legitimate questions and may be related to Spectrum's valuation.

The evidence regarding the retainer paid to bankruptcy counsel is inconsistent. Bankruptcy counsel's Federal Rule of Bankruptcy Procedure 2016(b) statement (Doc. No. 7) states he agreed to accept $3,516.00 for bankruptcy services and received $2,516.00 from the Debtor pre-petition The Debtor testified the Rule 2016(b) statement is inaccurate and the Chapter 13 retainer was paid by Spectrum.[87] The only funds the Debtor personally paid to bankruptcy counsel were for the bankruptcy filing fee of $194.00.

Bankruptcy counsel's fees exceeded the retainer and the Plan provides for payment of $3,500.00 to counsel. The Debtor's Affidavit of Accounting (Doc. No. 176, Exh. 5) sets forth bankruptcy counsel was paid $5,000.00 pre-petition in October 2004 and $25,000.00 post-petition in November 2005.[88] The Debtor testified he did not

---

78. *Id.*

79. State Farm's Exh. Nos. 17–27 (from Oct. 24, 2006 Hr'g).

80. State Farm's Exh. Nos. 16–27 (from Oct. 24, 2006 Hr'g).

81. State Farm's Exh. No. 18 (from Oct. 24, 2006 Hr'g) (Reconciliation Detail for Period Ending 11/30/2005).

82. The majority of this total consists of weekly payments of $561.92 made to the Debtor.

83. Oct. 24, 2006 Hr'g Tr., pp. 94–98.

84. Mar. 20, 2008 Hr'g Tr. at p. 28.

85. *Id.* at pp. 28, 52–55.

86. *Id.* at pp. 23–27.

87. *Id.* at p. 94.

88. These amounts were paid by Spectrum ($25,000.00 was paid to bankruptcy postpetition on November 10, 2005 by check number 7105 from Spectrum) (*see* State Farm's Exh. No. 18 from Oct. 24, 2006 Hr'g).

know whom the $25,000.00 payment benefitted.[89]

Spectrum's payment of $50,000.00 to counsel is not relevant to confirmation. The payment was made post-petition and did not affect Spectrum's valuation as of the Petition Date. Those funds were a portion of Spectrum's bank account balance on the Petition Date and were considered in the expert witnesses' valuation of Spectrum.

This bankruptcy case was a result of the District Court Litigation. Spectrum, on the Petition Date, was an existing business attempting to reestablish itself and to defend the District Court Litigation. Its assets, including cash on hand, were not property of the Debtor's bankruptcy estate. Spectrum made business decisions as to how to utilize its cash resources. Spectrum's relevance in the confirmation process is: (i) the Debtor's disclosure of his stock ownership; and (ii) the value of the stock on the Petition Date, which value was determined to be zero. Spectrum's cash expenditures are not relevant to confirmation.

The Debtor did not engage in bad faith with respect to the Spectrum disbursements, or with respect to any aspect of his case. All financial transactions were transparent and the Debtor provided detailed monthly financial reports to the Trustee.

The Debtor continues to be current with all Chapter 13 obligations. The Trustee continues to support confirmation. He has acted in good faith throughout his bankruptcy case. He has established all elements necessary for confirmation of his Plan.

### Conclusions

The Debtor is eligible to be a debtor in Chapter 13. He has regular income, his noncontingent, liquidated, unsecured debts on the Petition Date were less than $307,675.00, and his noncontingent, liquidated, secured debts were less than $922,975.00.

The totality of circumstances reflect the Debtor has acted in good faith throughout this case. He has not abused the provisions, purpose, or spirit of the Bankruptcy Code. He has fully cooperated with the Trustee. His failure to list an ownership interest in Spectrum in his original Schedule B was not an attempt to mislead the Court or creditors, but was an unintentional oversight. His interest in Spectrum was disclosed in original Schedules H and I and in his Statement of Financial Affairs. He amended Schedule B to remedy the oversight. He disclosed his interest in Spectrum to the Trustee prior to his meeting of creditors and submitted detailed reports disclosing its financial standing.

The Plan has been proposed in good faith and not by any means forbidden by law. It complies with the provisions of Chapter 13. All fees, charges, and amounts required by Chapter 123 of Title 28 and the Plan required to be paid prior to confirmation have been paid.

The value, as of the effective date of the Plan, of property to be distributed pursuant to the Plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the Debtor were liquidated in a Chapter 7 proceeding. The Debtor surrendered all collateral securing Claims 1, 2, and 4.

This bankruptcy case is not a two-party dispute involving State Farm and the Debtor. The Debtor's Schedules reflect

89.  Mar. 3, 2008 Hr'g Tr., p. 38.

he had numerous creditors, unsecured and secured, on the Petition Date. The Debtor was required to list all creditors, including those with known claims and those with potential claims. Bankruptcy provides for the resolution of all such claims. The Debtor resolved the claim of each secured creditor by surrendering the collateral securing their claims. The potential claims of the general unsecured creditors for unliquidated and disputed claims listed by the Debtor as a precaution in Schedule F will be addressed when the Debtor receives a discharge.

The Plan provides all of the Debtor's projected disposable income received in the three-year period beginning on the date that the first payment is due under the Plan will be applied to make Plan payments. The Debtor has committed his disposable monthly income to Plan contributions. The Plan represents the Debtor's good faith effort to satisfy his creditors' claims and was proposed with a sincere intent to repay his debts. He has demonstrated the ability to make all Plan payments and to comply with the Plan.

The fact the Debtor has made all Plan payments demonstrates feasibility. A plan is feasible where the debtor can make the monthly payments. The Plan meets all requirements for confirmation State Farm, as the holder of an allowed unsecured claim, will receive no less pursuant to the Plan than it would receive in a Chapter 7 liquidation. The Plan is due to be confirmed.

## CONCLUSIONS OF LAW

The principal purpose of the Bankruptcy Code is to grant a "fresh start" to "the honest but unfortunate debtor." *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Chapter 13, entitled "Adjustment of Debts of an Individual With Regular Income" and derived from Chapter XIII of the Bankruptcy Act of 1938, was enacted by Congress in the Bankruptcy Reform Act of 1978, Public Law No. 95–598. Chapter 13 was designed to protect overextended individual wage earners desiring to voluntarily repay their debts through the automatic stay and provide financial relief through a fresh start.

Chapter 13 "facilitate[s] adjustments of the debts of individuals with regular income through flexible repayment plans funded primarily from future income." *Green Tree Acceptance, Inc. v. Hoggle (In re Hoggle)*, 12 F.3d 1008, 1010 (11th Cir. 1994). The plan process permits " 'an individual to pay his debts and avoid bankruptcy by making periodic payments to a trustee under bankruptcy court protection, with the trustee fairly distributing the funds deposited to creditors until all debts have been paid.' " *U.S. v. Devall*, 704 F.2d 1513, 1515 (11th Cir.1983) (*quoting* S.Rep. No. 95–989, 95th Cong., 2d Sess. 12, *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5798).

### Confirmation Requirements

■ Section 1325 of the Bankruptcy Code sets forth the requirements for confirmation of a Chapter 13 plan. The Debtor bears the burden of establishing the confirmation requirements have been met. *In re Yunker*, 328 B.R. 591, 595 (Bankr. M.D.Fla.2005). "[T]he court shall confirm a plan if—":

(1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;

(2) any fee, charge, or amount required under chapter 123 of title 28, or by the plan, to be paid before confirmation, has been paid;

(3) the plan has been proposed in good faith and not by any means forbidden by law;

(4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;

(5) with respect to each allowed secured claim provided for by the plan—

. . .

(C) the debtor surrenders the property securing such claim to such holder; and

(6) the debtor will be able to make all payments under the plan and to comply with the plan.

11 U.S.C. § 1325 (2005).[90]

■ Additional standards apply if there is an objection to confirmation. Subsection (b)(1) of Section 1325 provides a court may not approve a plan if confirmation is objected to by the trustee or the holder of an allowed unsecured claim, unless, as of the effective date of the plan:

(A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or

(B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

11 U.S.C. § 1325(b)(1). A plan meeting the criteria of Section 1325 must be confirmed. 11 U.S.C. § 1325(a) ("the court shall confirm a plan if. . . .").

■ "Good faith" is the cornerstones requirement for confirmation. A debtor carries the burden of demonstrating a plan is presented in good faith. *In re Vick*, 327 B.R. 477, 486 (Bankr.M.D.Fla.2005).

■ The phrase "good faith" is not defined in the Bankruptcy Code. The existence or nonexistence of good faith is determined through a review of the totality of circumstances. *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens)*, 702 F.2d 885, 888 (11th Cir.1983) "Broadly speaking, the basic inquiry should be whether or not under the circumstances of the case there has been an abuse of the provisions, purpose or spirit of [the Bankruptcy Code]." *Id.* (*citations omitted*).

■ Factors/relevant to the good faith determination include:

(1) an analysis of the debtor's income from all sources and expenses;

(2) the probable or expected duration of the Chapter 13 plan;

(3) the motivations of the debtor and his sincerity in seeking relief under the provisions of Chapter 13;

(4) the debtor's degree of effort;

(5) the debtor's ability to earn and the likelihood of fluctuation in his earnings;

(6) the circumstances under which the debtor has contracted his debts;

(7) his past dealings with his creditors;

(8) the accuracy of the plan's statements of debts and expenses;

(9) the frequency with which the debtor has sought bankruptcy relief; and

(10) whether any inaccuracies are an attempt to mislead the court.

*Id.* at 888–89; *In re Vick*, 327 B.R. at p. 486. The list of factors is not exhaustive, "but they should aid bankruptcy courts as they determine whether debtors have pro-

---

**90.** The Debtor filed his case prior to the effective date of BAPCPA and, thus, BAPCPA's amendments to Section 1325 are not applicable.

posed chapter 13 plans in good faith." *Kitchens,* 702 F.2d at 889.

■ The "guiding principle" in a good faith analysis "is whether the debtor's proposed Chapter 13 plan demonstrates a sincere intent to repay his creditors to the best of his ability as opposed to instead demonstrating an attempt to defer or avoid the claims of legitimate creditors." *Florida, Dep't of Revenue v. Talley,* No. 3:07–cv–510–J16, 2008 WL 1711410, at *4 (M.D.Fla. April 10, 2008).

■ Good faith determinations are within the Court's discretion and denial of confirmation for bad faith occurs in extreme situations. "We hold that with section 1325(a)(3) Congress intended to provide bankruptcy courts with a discretionary means to preserve the bankruptcy process for its intended purpose.... If the court discovers unmistakable manifestations of bad faith ... confirmation must be denied." *Shell Oil Co. v. Waldron (In re Waldron),* 785 F.2d 936, 941 (11th Cir. 1986) (denying confirmation where debtfree, financially secure debtors utilized bankruptcy for sole purpose of rejecting an option contract).

■ The Eleventh Circuit Court of Appeals recognized egregious pre-petition conduct by a debtor, such as embezzlement of funds from an employer, does not bar confirmation of the debtor's Chapter 13 plan where the plan represents the debtor's good faith effort to satisfy his creditor's claims and has met the requirements of 11 U.S.C. Section 1325.[91]

■ The twin aims of bankruptcy are to provide "equitable distribution" of assets for creditors and a "fresh start" for a debtor "by releasing him, her, or it from further liability for old debts." *Central*

*Va. Cmty. Coll. v. Katz,* 546 U.S. 356, 363–64, 126 S.Ct. 990, 163 L.Ed.2d 945 (2006). The Debtor's Plan accomplishes both goals. The Debtor's non-exempt assets are being equitably distributed to his creditors and he is provided with a fresh start.

### Confirmation Requirements Fulfilled

■ The Debtor is not abusing/the bankruptcy process. He is utilizing the bankruptcy process for its intended purposes—to resolve his creditors' claims through equitable distribution of his assets and obtain a fresh start. The Debtor has established the elements for confirmation of the Plan and is entitled to a fresh start.

His Schedules and Statement of Financial Affairs were accurate on the Petition Date, with the exception of his omission of Spectrum in Schedule B. His failure to list Spectrum was an oversight and unintentional. He did not attempt to mislead the Court or his creditors. The Debtor's amended Schedules I and J reflect an accurate picture of his post-petition monthly income and expenses. No "unmistakable manifestations of bad faith" exist. The totality of circumstances reflects the Debtor has acted in good faith.

The Debtor meets all of the eligibility requirements of 11 U.S.C. Section 109(e). He is eligible to be a debtor in Chapter 13 pursuant to Section 109(e).

The Debtor has met all requirements of 11 U.S.C. Section 1322 and has submitted all of his projected disposable income to the supervision and control of the Trustee, for a period of three years, required for the execution of the Plan. Each claim within a particular class will receive the same treatment. The Plan provides for surrender of the collateral securing the secured creditors' claims and payment of State

---

**91.** *In re Britt,* 211 B.R. 74, 78 (Bankr. M.D.Fla.1997), *aff'd sub nom. Landis v. Britt,* No. 98–2315, 1998 WL 754827 (11th Cir. Oct.20, 1998).

Farm's allowed unsecured claim in an amount fulfilling the liquidation test requirements.

■■■■ Dismissal or abstention of a bankruptcy case may be appropriate where the case constitutes a two-party dispute between the debtor and a single creditor. *Waldron*, 785 F.2d at 940; *Federal Fin. Co. v. DeKaron Corp.*, 261 B.R. 61, 65–6 (S.D.Fla.2001). This case is not a two-party dispute involving only State Farm and the Debtor. The Debtor's schedules list numerous creditors. He was required to list all creditors, including those holding known claims and potential claims. Fed. R. Bankr.P. 1007(a), (b); 11 U.S.C. §§ 101(5)(10).[92] The Debtor resolved the claims of his secured creditors 1 through the Chapter 13 process by surrendering * their collateral. The potential claims of the Schedule F creditors will be resolved when the Debtor receives a discharge pursuant to 11 U.S.C. Section 1328.

The Debtor has met all of the requirements of 11 U.S.C. Section 1325. The Plan, pursuant to Section 1325(a)(1), complies with all applicable provisions of Chapter 13 and all fees, charge, amounts required by Chapter 123 of Title 28 and the Plan have been paid pursuant to Section 1325(a)(2).

The Plan has been proposed in good faith and not by any means forbidden by law pursuant to Section 1325(a)(3). The totality of circumstances establishes the Debtor has acted in good faith throughout this case. He has not abused the provisions, purpose or spirit of the Bankruptcy Code. The Plan represents a good faith effort by the Debtor to satisfy his creditors' claims and it was proposed with a sincere intent to repay his debts. He has fully cooperated with the Trustee. The Debtor has not engaged in any bad faith conduct.

The Debtor established the Plan meets the "best interests of creditors test" of 11 U.S.C. Section 1325(a)(4). The Debtor's Spectrum stock constitutes property of the estate pursuant to 11 U.S.C. Section 541(a). The value of the stock on the Petition Date and post-petition was zero or negligible. The value, as of the effective date of the Plan, of property to be distributed pursuant to the Plan on account of each allowed unsecured claim is not less than the amount that would be paid in a Chapter 7 proceeding. State Farm, as the holder of the sole allowed unsecured claim, will receive no less pursuant to the Plan than it would receive in a Chapter 7 liquidation.

The Debtor surrendered the property securing each secured claim pursuant to Section 1325(a)(5)(C). He will be able to make all Plan payments and to comply with the Plan in accordance with Section 1325(a)(6).

A Section 1325(b) analysis is required due to State Farm's objection to confirmation. The Debtor has committed his disposable monthly income, as defined by Section 1325(b)(2), to Plan contributions. The Plan provides, pursuant to Section 1325(b)(1)(B), all of the Debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the Plan will be applied to make Plan payments.

The Plan is feasible and meets all of the Chapter 13 statutory requirements for confirmation.

---

**92.** Section 101(5) of the Bankruptcy Code broadly defines "claim" to mean "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured...." 11 U.S.C. § 101(5)(A).

## Conclusion

State Farm has vigorously and insistently challenged the Debtor's right to a fresh start and asserted the Debtor was indebted to it for more than *$5,400,000.00.* This case, the jurisdiction, and its confirmation disputes were premised upon State Farm's insistence of a non-contingent liquidated multi-million dollar claim. The disposition of State Farm's claim provides perspective to this case. State Farm agreed to and was determined to hold a claim of $226,093.71—four percent of its asserted claim—and it consensually resolved the District Court Litigation.

A creditor has every right to raise objections in a bankruptcy proceeding, but its position should be realistic and well-grounded Legitimate disputes deserve the parties' and Court's resources. State Farm's objections were litigious and an attempt to prohibit the Debtor from obtaining bankruptcy relief.

The centerpiece of State Farm's confirmation objection was the Debtor's failure to adequately disclose his interest in Spectrum. State Farm knew of the Debtor's interest in Spectrum as early as 2003 and named Spectrum as a defendant in the District Court Litigation. Extensive discovery of the Debtor and Spectrum was conducted in connection with the District Court Litigation. The Debtor disclosed the existence of Spectrum to the Trustee and in his Schedules and Statement of Financial Affairs, and State Farm's counsel was present at the Debtor's Section 341 meeting, where the Debtor disclosed and discussed his interest in that company with the Trustee.

Chapter 13 provides the Debtor the opportunity to resolve the claims of his creditors through a voluntary repayment plan. Historically, Chapter 13 is an inexpensive and efficient mechanism for creditors to obtain realistic payment of their claims. The Debtor would have no feasible or practical recourse for resolving his financial issues outside the Chapter 13 proceeding. State Farm will obtain a realistic recovery with the Debtor through the Plan, and it is not as likely to obtain a recovery of this amount if the Debtor were denied Chapter 13 relief.

The Debtor has presented his Plan in good faith and has fulfilled each of the confirmation criteria. He is entitled to a fresh start. The plain language of 11 U.S.C. Section 1325 requires his Plan be confirmed.

Accordingly, it is

**ORDERED, ADJUDGED and DE-CREED** that State Farm's Objection (Doc. No. 174) to the March 20, 2008 hearing is hereby **OVERRULED;** and it is further

**ORDERED, ADJUDGED and DE-CREED** that State Farm's Objection (Doc. No. 81) to confirmation of the Debtor's Plan is hereby **OVERRULED** and the Debtor's Plan (Doc. No. 90) is **CON-FIRMED** effective November 14, 2006.